LaSALLE NATIONAL BANK, et al., Plaintiffs,

v.

DUFF & PHELPS CREDIT RATING CO. and Shawmut Bank Connecticut, N.A., Defendants.

No. 93 Civ. 4692 (WK) (AJP).

United States District Court, S.D. New York.

Nov. 26, 1996.

---

Alan R. Glickman, Schulte Roth & Zabel, New York City, for Plaintiffs.

Douglas M. Kraus, Skadden, Arps, Slate, Meagher & Flom, New York City, for Defendants.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, Senior District Judge.

Before us is an action brought by twenty-six institutional investors (plaintiffs), who purchased approximately $200 million of bonds offered by subsidiaries of Towers Financial Corporation in connection with its Ponzi scheme, against Duff & Phelps Credit Rating Co. ("defendant"), and Shawmut Bank Connecticut N.A. Defendant Duff & Phelps moved to dismiss plaintiffs' complaint. On June 19, 1996, Magistrate Judge Andrew J. Peck issued a Report and Recommendation recommending that we grant defendant's motion to dismiss plaintiffs' claim for aiding and abetting violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1964(c), but deny as to the remaining claims.

Plaintiffs object to Judge Peck's recommendation that the RICO claim be dismissed; defendant objects to the recommendation that its motion to dismiss be denied as to the other claims. After listening to, and fully considering, the arguments advanced by both parties in support of their opposition to parts of Judge Peck's Report and Recommendation, and having subjected the arguments to *de novo* review, we are persuaded that Judge Peck reached the correct conclusions, with one slight variance.

With respect to plaintiffs' claim for common-law negligent misrepresentation, Judge Peck held that New York law should apply as opposed to Illinois law. However, he further concluded that plaintiffs' claim would survive defendant's motion to dismiss under either state's law for negligent misrepresentation. Finding this conclusion accurate, we reserve resolution on the choice of law question for future proceedings. *See, e.g., Seldon v. Ra-*

*binowitz* (S.D.N.Y.1989) 706 F.Supp. 13, 14 ("the choice of law issue ... need not be addressed because the Court concludes that the resolution of this motion would be the same under the law of either state").

Accordingly, we adopt Judge Peck's Report and Recommendation with the above noted modification as to the choice of law question, and grant defendant's motion to dismiss the claim for aiding and abetting violation of RICO, but deny its motion to dismiss the remaining claims.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

**TO THE HONORABLE WHITMAN KNAPP, United States District Judge:**

This is one of several actions pending in this Court arising out of the alleged Ponzi scheme involving Towers Financial Corporation. This particular action is brought by twenty-six institutional investors who purchased approximately $200 million of Bonds offered by Towers' Healthcare Subsidiaries. The defendants are Duff & Phelps Credit Rating Co., who rated the Bonds, and Shawmut Bank Connecticut N.A., the Bond Indenture Trustee. In summary, the complaint alleges that Duff & Phelps participated in Towers' Ponzi scheme by assigning the inflated rating of "AA" (or "AA+") to the Bonds. (Cplt. ¶¶ 9–10.) The complaint asserts four causes of action against Duff & Phelps: (1) violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1994); (2) aiding and abetting violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c); (3) common law fraud; and (4) negligent misrepresentation.

Presently before the Court is Duff & Phelps' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below, I recommend that Duff & Phelps' motion to dismiss be granted as to plaintiffs' RICO claim but denied as to the remaining claims.

## FACTS

The various cases involved in the Towers litigation are more fully described in numerous prior decisions of this Court, three of which are particularly relevant to this decision and familiarity with which is assumed:

- *In re Towers Financial Corp. Noteholders Litigation*, 93 Civ. 0810 (S.D.N.Y. May 30, 1996) (Report and Recommendation to grant Duff & Phelps' motion to dismiss the Noteholders complaint against it);

- *Lasalle National Bank v. Duff & Phelps Credit Rating Co.*, 93 Civ. 4692, 1996 WL 393212 (S.D.N.Y. March 11, 1996) (Report and Recommendation to deny Shawmut's motion to dismiss without prejudice to renewal after the close of discovery) (affirmed by Judge Knapp by Order dated April 9, 1996); and

- *In re Towers Financial Corp. Noteholders Litigation*, 93 Civ. 0810, 1995 WL 571888 (S.D.N.Y. Sept. 20, 1995) (describing the allegations of the related Noteholder litigation; defined terms from this Report and Recommendation are used herein).

On a motion to dismiss, the Court must accept the well-pleaded allegations in the complaint as true. *In re Towers*, 1995 WL 571888 at *1 (*citing Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989)). This opinion will summarize the facts in the First Amended Complaint (the "complaint" or "Cplt.") as to

Duff & Phelps without resort to the phrase "plaintiffs allege" before each statement from the complaint.

### The Parties

The plaintiffs are LaSalle National Bank and 25 other institutional investors who purchased approximately $200 million in principal amount of Bonds issued by Towers' Healthcare Subsidiaries. (Cplt. ¶¶ 1, 12–37.)[1]

Defendant Duff & Phelps, a securities rating agency, rated the Bonds. (Cplt. ¶¶ 1, 5; Cplt. Ex. A at 16, 74.) Duff & Phelps is an Illinois corporation with its principal place of business in Chicago, Illinois. (Cplt. ¶ 39.) Defendant Shawmut served as the Indenture Trustee for the Bonds. (Cplt. ¶¶ 7–8, 38, 45.)

Although not named as a defendant, Towers Financial Corporation and its subsidiaries figure prominently in this action. Towers' principal place of business was New York City. (Cplt. ¶ 41.) Towers was engaged in acquiring and collecting healthcare receivables. (*Id.*) Towers issued the Bonds in question through five subsidiaries, Towers Healthcare Receivables Funding Corporations ("THRFC") I–V (collectively, the "Healthcare Subsidiaries" or the "Funding Corporations"). (Cplt. ¶¶ 3, 5, 44.) The combined amount of Bonds issued by the five Funding Corporations was $199,450,000.[2]

1. The plaintiffs are: LaSalle National Bank, Washington National Insurance Co., Xerox Financial Services Life Insurance Co., Vanguard Fixed Income Securities Fund Inc.—Short Term Corporate Portfolio, LaSalle Bank Lake View, LaSalle National Bank NorthBrook, National City Bank of Minneapolis, The Citizens Banking Company, Confederation Life Insurance Co., Park National Bank and Trust of Chicago, Lutheran Church Missouri Synod, The Independent Order of Foresters, Bank of Rantoul, The Castalia Banking Corporation, Talen, Inc., Edens

Bank, The Commercial and Savings Bank of Saint Clair County, Conseco Capital Management, European American Bank, Grabill Bank, Metropolitan Bank Trust Co., Uptown National Bank of Chicago, The Vintage Bank, LaSalle Northwest National Bank, LaSalle Bank Matteson, and American Trust & Savings Bank. (Cplt. ¶¶ 12–37.)

2. The following chart summarizes the dates and amounts of the five series of Bonds:

| Issuer | Date of Closings | Aggregate Principal Amount of Bonds Initially Issued and Outstanding Currently |
|---|---|---|
| THRFC I | 7/19/90 | $ 45,000,000 |
| THRFC II | 11/27/90 | $ 41,500,000 |
| THRFC III | 5/23/91 | $ 42,500,000 |
| THRFC IV | 12/18/91 and 2/26/92 | $ 42,500,000 |
| THRFC V | 5/5/92 and 7/30/92 | $ 27,950,000 |
| TOTAL | | $199,450,000 |

(Cplt. ¶ 44.)

*Towers' Receivables Program: How It Was Supposed to Work*

The legal relationships among the respective Funding Corporations, Towers and the Providers were described in the Private Placement Memoranda ("Offering Memoranda") and were controlled by: (1) the Indentures between the Funding Corporations and Shawmut, (2) the Servicing Agreements between Towers and the Funding Corporations, and (3) the Healthcare Purchase Contracts between Towers and the Providers. (Cplt. ¶ 45.) Attached to the Complaint as Exhibits A, B, and C, respectively, are the Offering Memorandum, Indenture (with the Healthcare Purchase Contract attached as an exhibit), and Servicing Agreement for THRFC V. The provisions of the Offering Memoranda, Indentures, Healthcare Purchase Contracts, and Servicing Agreements are essentially the same for each of the five Bond issues. (Cplt. ¶ 45.)

Towers' Healthcare Subsidiaries were to use the proceeds of the Bond sales to purchase "Qualified Healthcare Receivables," using a closed, "lockbox" system to insure that funds were properly collected and disbursed. (Cplt. ¶¶ 48–51.) Shawmut was to establish the accounts through which the money flowed; Duff & Phelps and Shawmut were to receive certain reports from Towers and the Healthcare Subsidiaries to insure proper operation of the "closed" system. (Cplt. ¶¶ 52–60.) The Indenture also set forth a number of limitations on the quality and diversity of receivables that the Healthcare Subsidiaries could purchase. (Cplt. ¶ 61.) These restrictions included: (1) a Provider Concentration Limitation; (2) an Aging Limitation; and (3) a Collateral Coverage Ratio. (*Id.*)

*Towers' Receivables Program: How It Actually Worked*

While the program was supposed to work as described above, the actual practice was very different:

Instead of carrying out the program as it had been structured, Towers and the Funding Corporations engaged in a massive fraud, diverting many millions of dollars for their own purposes and acquiring non-conforming receivables by varying the actual operations of the program from the provisions of the form Healthcare Purchase Contracts, the Servicing Agreements and the Indentures from the outset in material ways, including, among other things, the following:

a. inadequate documentation was presented by Towers, as servicer, to Shawmut, . . .

b. rather than sending their checks directly into the Lockbox Accounts, private Third Party Obligors were permitted to make payments to Providers . . .—thereby allowing further diversion of funds by Towers and, later, by the Providers themselves;

c. Towers and the Funding Corporations engaged in impermissible transfers of receivables among the five Funding Corporations, diverted Bondholder proceeds by improperly "upstreaming" money from the Funding Corporations directly to Towers for purposes other than the purchase of receivables, and violated the Aging Limitation, the Collateral Coverage Ratio, and the Provider Concentration Limitation; and

d. many of the Healthcare Purchase Contracts are in a form inconsistent with the form required by the Indentures. . . .

(Cplt. ¶ 70.) "[M]ost or all of the foregoing breaches of the Servicing Agreements and the Indentures . . . were or should have been discovered by Duff & Phelps, had Duff & Phelps properly conducted the due diligence and ongoing review and oversight it claimed it would conduct." (Cplt. ¶ 71.)

*The Complaint's Specific Allegations As To Duff & Phelps*

"In purchasing and retaining the Bonds, plaintiffs relied . . . upon the 'AA' rating assigned to the Bonds by defendant Duff & Phelps." (Cplt. ¶ 1.) "Plaintiffs' injuries would have been averted if . . . Duff & Phelps had properly performed the initial investigation and the post-issuance monitoring that it claimed to perform, identified any of the numerous occurrences (both prior and subsequent to the issuances of the Bonds) that materially adversely affected the likeli-

hood of timely payment of principal and interest with respect to the Bonds, and initially either assigned appropriately lower ratings to the Bonds or refused to rate them at all and subsequently either lowered or withdrew the ratings." (Cplt. ¶ 7.) While Duff & Phelps received compensation for its services, it did not fulfill its duties to the Bondholders. (Cplt. ¶ 7.)

Duff & Phelps rated each Bond series before issuance, and in fact had "substantial influence" in the design of each Bond program and drafting the program's operational documents:

> Duff & Phelps also played a critical role with respect to the Funding Corporations' Bond issuances, and Duff & Phelps had substantial influence in the drafting of the documents pursuant to which the program was to be operated. As the program was structured, each Duff & Phelps rating was necessary to sell the Bonds and to assure investors of their initial and continuing investment quality. It was a condition of the initial issuance of each series of the Bonds that Duff & Phelps rate them "AA" (Indenture § 206(5) (Ex. B p. 26)), which is defined by Duff & Phelps to mean: "High credit quality. Protection factors are strong. Risk is modest but may vary slightly from time to time because of economic conditions." Prior to the issuance of each series of the Bonds, Duff & Phelps assigned a rating of "AA" to each Bond issue, and consented to the use of its name and the assigned rating in connection with the disclosure documents, advertisements, and description of the issue.

(Cplt. ¶ 63.) As plaintiffs explain, "unlike debt obligations of operating companies or governmental entities (such as municipal bonds), asset-backed securities typically are not issued at all unless they are rated double- or triple-A. The rating is therefore not determined by an analysis of an already-issued security, but rather by structuring the receivables program as required by the rating agency so as to be able to obtain the desired rating.... Moreover, ... it is the structure of the program and the quality of its servicer (in this case Towers), rather than the creditworthiness of the issuing entity (in this case

the Funding Corporations), that determines the ratings." (Plfs' Br. at 5–6.)

Duff & Phelps conducted extensive due diligence prior to rating the Bonds, and required detailed reports to monitor the continued accuracy of its ratings:

> Duff & Phelps purported to conduct extensive due diligence prior to assigning the ratings, and in order to enable it to monitor the continued accuracy of its ratings, required that the Indentures and Servicing Agreements provide for Duff & Phelps to receive certain detailed reports. These reports included quarterly certificates of each Funding Corporation's compliance with the Collateral Coverage Ratio; and detailed Servicer Accounting Reports and annual reports described herein. Indenture § 1005(a) (Ex. B pp. 90–91); Servicing Agreement § 7.01(b) and (c) (Ex. C, pp. 24–25.)

(Cplt. ¶ 65.)

### Duff & Phelps' Evaluation Of Towers As A Servicer

"Prior to the issuance of the first series of Bonds by THRFC I, Duff & Phelps conducted a separate evaluation of Towers, and on March 22, 1990, issued to Steven Hoffenberg, Towers' Chairman, an evaluation of Towers' capability to act as servicer with respect to a securitized transaction involving the securitization of healthcare receivables." (Cplt. ¶ 66; see Cplt. Ex. D.) Duff & Phelps' evaluation, which was "positive," was purportedly based on "Duff & Phelps' actual observation of Towers' servicing operations, analysis of the data processing systems, and an analysis of Towers' financial condition." (Cplt. ¶ 66.)

The March 22, 1990 letter from Duff & Phelps to Towers states in part:

> This evaluation includes the observation of your servicing operations, in terms of both data processing and human resources, and the analysis of the financial condition of Towers Financial Corporation, and was performed with the knowledge that Towers is currently an active participant in the issuance and servicing of asset-backed securities.
>
> We are of the opinion that Towers Financial Corporation has the capability to

act as servicer with respect to a securitized transaction involving the securitization of healthcare receivables. This opinion ... will be reflected in our rating analysis....

In order to maintain confidence in this opinion, we require an annual review of Towers involving your servicing operations and financial condition.

(Cplt.Ex. D.)

According to three Duff & Phelps pamphlets—"The Rating of Secured Consumer Receivables," "Credit Decisions" and "Servicer Review Policy"—Duff & Phelps engaged in the following activities before assigning a rating to the Bonds:

• analyzed the issuer's servicing capabilities, including on-site evaluations of the servicer, interviewing the issuer's management and staff, review of written servicing procedures, cash management, customer service, collection policies, computer systems, and reporting capabilities;

• evaluated the servicer's capability for producing reports at least monthly that accurately reflect the performance of the assets;

• analyzed the proposed financing (cash flow) structure of the program;

• evaluated the form and quality of the credit enhancement and the legal considerations surrounding the issue of the Bonds;

• performed due diligence on the Bonds' collateral;

• reviewed management's close supervision of cash management operations including "prompt deposit of funds to appropriate accounts" and "the flow of information between the servicer and the lockbox provider";

• discussed with management the servicer's history and any "past litigation or pending legal action involving the company or any principals of the company"; and

• "determine[d] that the rating assigned is an accurate representation of the likeli-

hood of timely payment of principal and interest to the holders of the Bonds."

(Cplt. ¶¶ 120–22 & Cplt. Exs. N, O at 2, P.)

### *Duff & Phelps' Rating and Post–Rating Monitoring of the Bonds*

The Indentures required Duff & Phelps to rate the Bonds "AA" before each Bond series could be issued. (*E.g.,* Cplt. ¶ 63; Cplt. Ex. B: Indenture § 206(5) at p. 26.)

"On or about July 18, 1990, November 26, 1990, May 20, 1991, December 18, 1991, February 26, 1992, May 5, 1992 and July 27, 1992, Duff & Phelps assigned a rating of 'AA' to Bonds issued by THRFC I, THRFC II, THRFC III, THRFC IV and THRFC V. On or about December 12, 1991, Duff & Phelps upgraded its rating on the Bonds issued by THRFC I, THRFC II and THRFC III from 'AA' to 'AA+.'" (Cplt. ¶ 114; *see also* Cplt. ¶ 94.) [3]

In the course of Duff & Phelps' due diligence investigation in 1990, "Duff & Phelps discovered, or was reckless in failing to discover, the extensive history of fraud, securities law violations and bankruptcies with which Hoffenberg, Towers and/or its affiliates had been recently involved, and the state investigations and prosecutions that were then underway." (Cplt. ¶ 67.) Moreover, after issuing the initial rating for THRFC I, "Duff & Phelps knew from its purported review of the operations of the Funding Corporations, or was reckless in failing to discover, that, in violation of the Indentures and Servicing Agreements, Towers was purchasing receivables encumbered by prior liens, diluting the collateral for the Bonds and undermining the credit enhancement provisions of the Bonds upon which Duff & Phelps' ratings were based." (Cplt. ¶ 68.)

After issuance of its THRFC I rating, Duff & Phelps "learned of, or recklessly failed to discover, the numerous improper deviations by Towers, the Funding Corporation and Shawmut from the terms of the documents governing the programs, but nonetheless

---

**3.** On January 29, 1993, Duff & Phelps withdrew its "AA+" ratings for THRFC I Bonds and placed the HTRFC II–V Bonds "under review." (Cplt. ¶ 106.) On February 11, 1993, Duff & Phelps withdrew its ratings of the THRFC II–V bonds. (*Id.*) The SEC had begun investigating Towers in late 1992 and sued Towers on February 8, 1993. (Cplt. ¶ 99.)

maintained the 'AA' rating it had already issued for the THRFC I Bonds and issued the same rating for subsequent Bond issues." (Cplt. ¶ 69.)

As part of its ratings process, Duff. & Phelps committed to monitor the Bond programs and review the Bond ratings on a quarterly basis "in order to enable it to reaffirm, upgrade or downgrade the outstanding ratings." (Cplt. ¶ 9; *see also* Cplt. ¶¶ 65, 118; Cplt. Ex. N: Duff & Phelps pamphlet titled "The Rating of Secured Consumer Receivables" at 2, 7.) Duff & Phelps required that the Indenture and Servicing Agreements provide for Duff & Phelps to receive monthly, quarterly and annual reports from the Funding Corporations to facilitate Duff & Phelps' ongoing review of the credit quality of the bonds. (Cplt. ¶¶ 65, 119.)

"Contrary to Duff & Phelps' ratings, none of the Bonds was of high credit quality with strong protection factors and modest risk." (Cplt. ¶ 10.) Duff & Phelps "improperly assigned the ratings, and made other materially false and misleading representations and omissions with respect to the initial THRFC I Bond issue with knowledge of such matters as Towers' past history of fraud and securities law violations, or with reckless disregard of that history." (*Id.*) Duff & Phelps continued to assign "AA" ratings and make further material misrepresentations and omissions with respect to the subsequent Bond offerings and "in each case failed to reassess the rating of the then issued and outstanding Bonds." (Cplt. ¶ 10.)

Moreover, Duff & Phelps failed to properly conduct its due diligence inquiry into the facts and circumstances underlying the transactions and therefore either knew (or was willfully blind in failing to discover) that the Bond programs were not being operated in compliance with the governing Indentures and Servicing Agreements. (Cplt. ¶¶ 67–69, 94–95.) Specifically, Duff & Phelps knew or was reckless in not discovering that: Towers and the Providers did not use the prescribed Healthcare Purchase Contract; Towers failed to submit the reports required by the Servicing Agreement; and that proceeds were not being deposited in the lockbox accounts. (Cplt. ¶¶ 74–75, 80.) Duff & Phelps failed to notify the Bondholders of the non-compliance, continued to issue "AA" ratings, and failed to "downgrade or withdraw its outstanding ratings for any of the Bonds." (Cplt. ¶¶ 7, 9, 10, 69, 94–95).

### Duff & Phelps' Oral Misrepresentations to Plaintiffs and Broker–Dealers

In addition to its due diligence (or reckless lack thereof) in connection with its Bond ratings, Duff & Phelps also spoke directly to some of the plaintiffs "both before and after their purchases, extolling the purported merits" of Towers' Bonds, and also made oral misrepresentations to "at least one broker-dealer who was marketing the Bonds." (Cplt. ¶ 9; *see also* Cplt. ¶ 64.)

Mark Tuttle of Duff & Phelps made oral material misrepresentations to several plaintiffs. Specifically, Tuttle misrepresented:

• to Bruce Dunn of plaintiff Washington National Insurance Company in the summer of 1990 that Duff & Phelps had arrived at its proposed rating after extensive on-site review of Towers organization and computer systems and that it would review the receivables that comprised the collateral pool for the Bonds;

• to Kevin Kubik of plaintiff Xerox Financial Services Life Insurance Company on April 17, 1990 that Duff & Phelps would review THRFC I's portfolio of receivables monthly to determine the performance of the receivables providing collateral for the bonds, and on May 13, 1994, that THRFC I was "doing fine and continued to qualify for the 'AA' rating";

• to Paul Wenzler of plaintiff Vanguard Fixed Income Securities Fund Inc., in late spring or early summer 1991, prior to its purchase of the Bonds, that the Bonds "seemed solid," and after its purchase of the Bonds, that everything was "okay with THRFC I's operations";

• to John Walker of Confederation Life Insurance Company prior to its purchase of THRFC II Bonds, that Duff & Phelps conducted a due diligence process that involved meetings with Towers' management, customers and auditors, and that the

Indenture provisions assuring the quality of the collateral "would be followed";

• to Confederation Life on December 11, 1992 to reaffirm its "AA" rating for THRFC III, and to plaintiff Washington National Insurance Co. on October 27, 1992 to reaffirm its "AA" rating for THRFC IV;

• to Walker of Confederation Life on April 29, 1992, representing that THRFC I–IV "were doing fine and had all gone according to plan, and that the ability of Towers' personnel and systems to handle the growing number of receivables was not a concern";

• to David Sullivan of plaintiff American Trust & Savings Bank in late spring and early summer 1990, explaining that "Duff & Phelps had performed substantial due diligence to support its ratings for the Bonds" and to verify the accuracy of conversations Sullivan had had with Towers' personnel concerning the safeguards in the Indentures; and

• to C.C. Wong of plaintiff The Independent Order of Foresters in late 1992 "that the notes to the 1992 Financial Statements revealed only operational problems or technical defaults that did not constitute a credit issue" requiring Duff & Phelps to put the Bonds on a credit watch.

(Cplt. ¶ 116; *see also* Cplt. ¶ 64.)

Duff & Phelps represented to broker-dealers who marketed the Bonds to plaintiffs that Duff & Phelps would "oversee and monitor the performance of the Bonds after their issue." (Cplt. ¶ 64.) Duff & Phelps made assertions with respect to the Bonds in three documents,[4] each of which Duff & Phelps provided to brokers "with the understanding that the statements therein would be used in connection with the sale of the Bonds issued by the Funding Corporations." (Cplt. ¶ 117.) Indeed, some of the plaintiffs received these documents. (Cplt. ¶ 117.) The documents asserted:

• that prior to assigning its rating to the Bonds, Duff & Phelps had analyzed (among other things) the quality of the Funding Corporation's Third Party Obligors and Towers' servicing capabilities;

• that the Bonds provided a high level of credit quality, that the initial collateralization level was 200% of the face value of the Bonds and that the collateralization level could not decline below 180% or a Principal Amortization Event would occur;

• that payments for receivables purchased by the Funding Corporations are remitted to a lockbox account under Shawmut's supervision; and

• that Duff & Phelps' rating was based on the establishment of safeguards and the results of Duff & Phelps' on-site review of Towers.

(Cplt. ¶ 117.)

### Duff & Phelps' Misrepresentations and Omissions to Disclose Material Facts

"[T]he 'AA' and 'AA+' ratings assigned to the Bonds were false and misleading because, upon their issuance and at all times thereafter, the Bonds were not of high quality, did not have strong protection factors, and had excessive risk, and those ratings did not accurately represent the likelihood of timely payment of principal and interest to the holders of the Bonds." (Cplt. ¶ 123.)

In addition, "Duff & Phelps' representations in respect to the Bonds were materially false and misleading, and omitted to disclose material information required to make its representations not misleading," because "contrary to Duff & Phelps' ratings and its other representations":

• Duff & Phelps did not "review the receivables of the Funding Corporations on a monthly basis to assure that safeguards built into the system were maintained";

---

4. The three documents, attached to the Complaint as Exhibit M, are: (1) "New Financing Report/Financial Group," a five-page document dated October 12, 1990; (2) a draft three-page document describing the Bonds, dated December 14, 1989; and (3) a draft document describing the Bonds, dated May 17, 1989. All three of the documents include discussions of the following topics: description of the securities; the reasons for the "AA" rating; payment security; and risks associated with the Bonds.

- "operations of the Funding Corporations were not okay, were not doing fine, and were not going according to plan";
- "the defaults reflected in the 1992 Financial Statements were not merely technical, and were sufficiently serious, given the structure of the transaction, of which Duff & Phelps was aware, to merit inclusion of the Bonds in Duff & Phelps' credit watch";
- "collections on receivables were not sent by Third Party Obligors directly to a Lockbox Account maintained by Shawmut";
- "the receivables serving as collateral for the Bonds were not of adequate strength";
- "Towers and its Chairman did not have the background to warrant the Bonds' 'AA' rating"; and
- "Duff & Phelps continually failed to disclose that it was not receiving the reports required, nor did it disclose the other breaches and defaults by Towers, the Funding Corporations or Shawmut of which it was aware."

(Cplt. ¶ 123.)

### Duff & Phelps' Knowledge of Its Misrepresentations

Duff & Phelps "knew from its purported extensive due diligence and monitoring, and from its receipt—or lack thereof—of reports from Towers and the Funding Corporations," or recklessly disregarded, that:

- Towers and its chairman, Steven Hoffenberg, had a long history of federal and state securities law violations;
- Towers purchased receivables from Providers pursuant to Healthcare Purchase Contracts that were not substantially identical to those described in the Indentures;
- Third–Party Obligors and Providers were failing to make deposits directly to the Lockbox Accounts as required;
- The Funding Corporations were not in compliance with the Provider Concentration Limitations, were violating the Aging Limitations, and were not properly computing the Collateral Coverage ratios;
- The Funding Corporations advanced monies to Towers unrelated to the purchase of receivables;

- Towers was failing to provide to Duff & Phelps the detailed itemization of receivables required by the Servicing Agreements; and
- Towers, and therefore the Funding Corporations, had receivables serving as collateral for the Bonds that were not of adequate strength.

(Cplt. ¶ 125.)

Finally, plaintiffs claim that:

Duff & Phelps knew that the ratings referenced in each of the Offering Memoranda were false, or was reckless in not so discovering, and knew that plaintiffs would rely on those ratings. By issuing these ratings and agreeing to their use by Hoffenberg and also by making other representations concerning the Bonds and participating in the sale of the Bonds, and thereby assisting in the success of the sale of the Bonds, Duff & Phelps substantially assisted in the commission of the predicate acts constituting Hoffenberg's violation of 18 U.S.C. § 1962(c).

(Cplt. ¶ 143.)

### The Complaint's Causes of Action Against Duff & Phelps

Count One alleges that Duff & Phelps violated § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j. (Cplt. ¶¶ 113–132.)

Count Two alleges that Duff & Phelps aided and abetted a violation of RICO, 18 U.S.C. § 1964(c). (Cplt. ¶¶ 133–145.)

Count Three alleges that Duff & Phelps committed common law fraud. (Cplt. ¶¶ 146–49.)

Count Four alleges negligent misrepresentation by Duff & Phelps. (Cplt. ¶¶ 150–56.)

Counts Five, Six and Seven are asserted only against Shawmut. (Cplt. ¶¶ 157–91.)

### ANALYSIS

### I. THE APPLICABLE LAW

#### A. The Standard Governing a Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6)

A district court should deny a motion to dismiss " 'unless it appears to a certainty

that a plaintiff can prove no set of facts entitling him to relief.'" *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir.1993) (*quoting Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984)), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994). A court must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party—here, plaintiffs. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Macmillan, Inc. v. Federal Ins. Co.,* 764 F.Supp. 38, 41 (S.D.N.Y.1991). This general rule applies to fraud claims. *IUE AFL–CIO Pension Fund,* 9 F.3d at 1052; *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990) ("When fraud is asserted, the general rule is simply applied in the light of Rule 9(b)'s particularity requirements.").

Additionally, a Rule 12(b)(6) motion challenges only the face of the pleading. Thus, in deciding a 12(b)(6) motion, "the Court must limit its analysis to the four corners of the complaint." *Vassilatos v. Ceram Tech Int'l Ltd.,* 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y. May 19, 1993) (*citing Kopec v. Coughlin,* 922 F.2d 152, 154–55 (2d Cir. 1991)). When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed.R.Civ.P. 56. Fed.R.Civ.P. 12(b); *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988).

On a motion to dismiss, the Court, however, may consider documents attached to the complaint as an exhibit or incorporated in the complaint by reference. *E.g., Paulemon v. Tobin,* 30 F.3d 307, 308–09 (2d Cir.1994); *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993). The following seven documents were referred to extensively in and also attached to the complaint: (1) the Offering Memoranda (Cplt.Ex. A), (2) the Indenture Agreement (Cplt.Ex. B), (3) the Servicing Agreement (Cplt.Ex. C), (4) the March 22, 1990 Duff & Phelps letter to Towers (Cplt.Ex. D), (5) Duff & Phelps "The

Rating of Secured Consumer Receivables" (Cplt.Ex. N), (6) Duff & Phelps' "Credit Decisions" (Cplt.Ex. O), and (7) Duff & Phelps' "Servicer Review Policy" (Cplt.Ex. P). Accordingly, the Court will consider those documents on this motion.

## B. *Pleading Requirements for Fraud Under Fed.R.Civ.P. 9(b)*

In considering the sufficiency of plaintiffs' § 10(b) claim, the Court must determine the adequacy of the complaint's allegations pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1127 (2d Cir.1994).

Fed.R.Civ.P. 9(b) sets forth special pleading requirements for fraud claims:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Although Rule 9(b) must be read together with Rule 8(a), which requires only a "short and plain statement of the claim," the fraud allegations in the complaint must be specific enough to allow the defendant "a reasonable opportunity to answer the complaint." *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990); *O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 225 (S.D.N.Y.1989) (Rule 9(b) is "designed to provide a defendant with fair notice of a plaintiff's claim in order to enable a defendant to prepare a defense, protect defendant's reputation or goodwill from harm, and reduce the number of strike suits."). Furthermore, the complaint must give the defendant "adequate information" to allow the defendant "to frame a response." *Id.*

In order to satisfy the Rule 9(b) pleading requirement for fraud under § 10b and Rule 10b–5, the Second Circuit requires that the complaint must:

> (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.

*Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d at 1127–28; *see also* cases cited in *In re Towers,* 1995 WL 571888 at *13.

Although Rule 9(b) provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," the relaxation of Rule 9(b)'s specificity requirement does not give "license to base claims of fraud on speculation and conclusory allegations." *Acito v. IMCERA,* 47 F.3d at 52.

The Second Circuit requires that "a plaintiff alleging fraud in connection with a securities transaction must specifically allege the acts or omissions upon which his claim rests. It will not do merely to track the language of Rule 10b–5 and rely on such meaningless phrases as 'scheme and conspiracy' or 'plan and scheme and course of conduct to deceive.'" *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

Furthermore, a complaint alleging fraud against multiple defendants must state the allegations specifically attributable to each individual defendant. *E.g., DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242, 1247 (2d Cir.1987).

### C. Elements of a Primary § 10(b)/Rule 10b–5 Claim

Section 10(b) of the Exchange Act and SEC Rule 10b–5 prohibit fraudulent activities in connection with the purchase or sale of securities, whether or not those securities are registered.[5]

In order to state a prima facie case of a violation of § 10(b) and Rule 10b–5, a plaintiff must allege that:

---

**5.** Section 10(b) makes it unlawful:
To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe....

15 U.S.C. § 78j(b). Further, Rule 10b–5 makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

---

██ "in connection with the purchase or sale of securities, the defendant, [2] acting with scienter, [3] made a false material representation or omitted to disclose material information and that [4] plaintiff's reliance on defendant's action [5] caused [plaintiff] injury."

*In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 264 (2d Cir.1993) (*quoting Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985)), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994). The failure to establish any element is fatal to a section 10(b)/Rule 10b–5 claim. *See, e.g., Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 190–91, 114 S.Ct. 1439, 1455, 128 L.Ed.2d 119 (1994); *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 94 (2d Cir.1981) ("Because we find that Wilson has failed to demonstrate his reliance on any actions by appellees, we need not reach the other elements of his 10b–5 claim."). For a discussion of the effect of the Supreme Court's *Central Bank* decision on plaintiffs' complaint, *see In re Towers,* 1995 WL 571888 at *14–15.

### II. DUFF & PHELPS' MOTION TO DISMISS PLAINTIFFS' SECTION 10(b)/ RULE 10b–5 AND COMMON LAW FRAUD CLAIMS SHOULD BE DENIED

#### A. The Statute of Limitations Does Not Bar Plaintiffs' Rule 10b–5 Claim

In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991), the Supreme Court held that a Rule 10b–5 action must be brought within one year of discovery of the facts giving rise to the violation (and within three years after such violation).

---

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

"Discovery" for purposes of the statute of limitations "includes constructive or inquiry notice, as well as actual notice." *E.g., Menowitz v. Brown,* 991 F.2d 36, 41 (2d Cir. 1993).

Duff & Phelps argues that plaintiffs' Rule 10b–5 claim is barred by the one year from discovery statute of limitations. (D & P Br. at 10–11.) Duff & Phelps asserts that Shawmut, as the Board Indenture Trustee, was an "agent" of the plaintiff Bondholders. Duff & Phelps asserts that plaintiffs allege in the complaint that Shawmut " 'knew or should reasonably have known after the first month of operations' that each of the Indentures were not being honored." (D & P Br. at 11, quoting Cplt. ¶ 2.) Duff & Phelps concludes that since plaintiffs allege that Shawmut "had notice of the alleged fraud as early as August 1990—almost three years before this lawsuit was filed," notice is also imputed to plaintiffs as result of the agency relationship. (D & P Br. at 12, citing Cplt. ¶ 44.) [6]

The issue on Duff & Phelps' statute of limitations motion is whether Shawmut as Bond Trustee is plaintiffs' agent such that Shawmut's knowledge should be attributed to plaintiffs. The Court holds that Shawmut is not the Bondholders' agent.

"It is well-settled that the principal is bound by notice to or knowledge of his agent in all matters within the scope of his agency although in fact the information may never actually have been communicated to the principal." *Farr v. Newman,* 14 N.Y.2d 183, 187, 250 N.Y.S.2d 272, 275, 199 N.E.2d 369 (1964); *see also, e.g., Smalls v. Reliable Auto Service, Inc.,* 205 A.D.2d 523, 524, 612 N.Y.S.2d 674, 676 (2d Dept.1994).

■ "A person may be both agent of and trustee for another." 1 Scott & Fratcher, *Scott on Trusts* § 8 at 95 (4th ed. 1987). As the Restatement of Agency explains, however, there is a distinction in the roles played by an agent and a trustee:

An agent acts for and on behalf of his principal and subject to his control; *a trustee who is not an agent is not subject to the control of the beneficiaries* although he is under a duty to deal with the trust property for their benefit in accordance with the terms of the trust and can be compelled by them to perform his duty. The agent owes a duty of obedience to his principal; a trustee is under a duty to conform to the terms of the trust.

Restatement (Second) of Agency § 14B, comment f (1957) (emphasis added). The Second Circuit has held that an indenture trustee is different from an ordinary trustee in that "an indenture trustee is more like a stakeholder whose duties and obligations are *exclusively defined* by the terms of the indenture agreement." *Meckel v. Continental Resources Co.,* 758 F.2d 811, 816 (2d Cir.1985) (emphasis added); *see also In re Drexel Burnham Lambert Group Inc.,* 90 B 10421, 1992 WL 53742 at *3 (S.D.N.Y.1992).

■ In order to establish that an agency relationship existed between the purported agent (Shawmut) and principal (the Bondholders), Duff & Phelps must establish three elements:

First, there must be a manifestation by the principal that the agent shall act for him. Second, the agent must accept the undertaking. Lastly, there must be an understanding between the parties that the principal is to be in control of the undertaking.

*Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F.Supp. 1522, 1546 (S.D.N.Y.1991). The Second Circuit has stated that an "essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control." *In re Shulman Transport Enterprises, Inc.,* 744 F.2d 293, 295 (2d Cir.1984).

■ Duff & Phelps relies on the Indenture Agreement as evidence to support its allegation that Shawmut and the Bondholders had

---

6. Moreover, Duff & Phelps maintains that Shawmut's receipt of Towers' 1991 financial statement on September 30, 1991 further put Shawmut and plaintiffs on notice of the fraud. (D & P Br. at 12.) Duff & Phelps further asserts that Shawmut's knowledge of Towers' and its subsidiaries' breaches of the Servicing Agreements and Indentures included knowledge of: (1) the failure to use the correct form of purchase contract (Cplt. ¶ 71); (2) the diversion of funds by Towers (Cplt. ¶¶ 76–79); and (3) the manipulation of receivables and funds as revealed in the 1991 Financial Statements delivered to Shawmut (Cplt. ¶¶ 82–93). (D & P Reply Br. at 6.)

an agreement that Shawmut would be the Bondholders' agent. (*See* D & P·Br. at 11 n. 1; D & P Reply Br. at 9–10.) The only parties to the Indenture Agreement, however, are Shawmut and the Towers Healthcare Subsidiary, not the Bondholders. (Cplt. Ex. B: Indenture Agreement at 1.) As proof that an agency relationship existed between Shawmut and the Bondholders, Duff & Phelps points to four provisions in the Indenture Agreements: (1) the "Control by Holders" provision (Cplt. Ex. B: Indenture § 512); (2) the Bondholders' right of removal of the Trustee (*id.* § 610(c)); (3) the Bondholders' power to appoint the Trustee's successor (*id.* § 610(e)); and (4) the inability to change the Indenture Agreement without the Bondholders' consent (*id.* § 802). (*See* D & P Br. at 11 n. 1; D & P Reply Br. at 9–10.)

The first of these provisions, the "Control by Holders" provision reads:

> The Holders of not less than a majority in aggregate outstanding principal amount of the Outstanding Bonds shall have the right to direct the exercise of, and the time, method and place of conducting any proceeding for any right or remedy available to the Trustee ... provided that: (1) such direction shall not be in conflict with any rule of law or with this Indenture....

(Indenture § 512, at 60.) Rather than establishing the Bondholder's control over the Trustee, this provision does little more than provide that the Bondholders may require the Trustee to exercise one of its conferred powers, and may determine the time and place of exercise.

The Bondholders' removal power (Cplt. Ex. B: Indenture § 610(c)) is insufficient to establish control for agency purposes, especially in light of the fact that the Issuer also retained such removal power (*id.* ¶¶ 610(d)–(f)). *See* Restatement (Second) of Agency § 14B, comment h ("The mere fact that by the terms of the trust a power of revocation is reserved to the settlor does not make the trustee an agent.").

Finally, the Issuer may make supplemental changes in the Indenture agreement, while the Bondholders only have the power of consent to such changes. (*Id.* § 802.)

In *Westinghouse Elec. & Mfg. Co. v. Brooklyn Rapid Transit Co.*, 291 F. 863 (S.D.N.Y.1922), the Court was similarly confronted with the question of whether a trust company which acted as a bond trustee had knowledge "imputable to the bondholders." *Id.* at 873. In finding that the bondholders were not chargeable with the trustee's knowledge, the Court quoted a Supreme Court decision with approval:

> "The question then arises whether notice to one of the trustees in this deed of trust is notice to the holders of the mortgage bonds in such manner that, in a suit by the trustees to enforce payment of the county bonds, the character of a bona fide holder without notice is lost. In *Curtis and others v. Leavitt*, 15 N.Y. 9, 194, the court say: 'If Graham, one of the trustees, was chargeable, as director of the company, with knowledge that there had been no previous resolution, notice to him was not notice to his cestuis que trust. He did not stand to them in the relation of an agent. He was selected and appointed as a trustee by the company, not by the cestuis que trust. His powers and duties were prescribed by the company, not by the bondholders. There were, at the time of the execution of the trust deeds, no bondholders, no cestuis que trust. It is a necessary attribute of an agency that it should be created by the principal. * * * In this case, as the relation of principal and agent did not exist between the bondholders and Graham, notice to him, or knowledge by him, ... was not constructive notice to the bondholders."

*Id.* at 875 (quoting *Commissioners of Johnson County v. Thayer*, 94 U.S. 631, 644–45, 24 L.Ed. 133 (1876)).

Duff & Phelps has not cited, nor has the Court found, any case where an Indenture Trustee was found to be the agent of the bondholders for statute of limitations notice or similar purposes. *Westinghouse* remains good law and controls here. Shawmut as Indenture Trustee is not the Bondholders' agent. Therefore, I recommend that the Court deny Duff & Phelps' motions to dismiss the Bondholders' Rule 10b–5 claim on statute of limitations grounds.

## B. *Plaintiffs Have Sufficiently Alleged the Elements of a Rule 10b–5 (and Common Law Fraud) Action*

### 1. *Plaintiffs Have Adequately Alleged Actionable Misrepresentations In Connection With the Sale of a Security*

█ Duff & Phelps contends that its rating of the Bonds is not an actionable misrepresentation in light of *In re Republic Nat'l Life Ins. Co.*, 387 F.Supp. 902 (S.D.N.Y. 1975). Duff & Phelps argues that as a result of *Republic*, rating services can never be liable for expressing an opinion recommending a security. (D & P Br. at 16–17.)

In *Republic*, plaintiff shareholders sued Standard & Poor's Corp. ("S & P") and A.M. Best Co. for Rule 10b–5 liability on the grounds that reports published by S & P and Best about Republic's financial condition which recommended Republic as a "good investment" contained false information. 387 F.Supp. at 904. The Court concluded that because Best and S & P "had no transactions of any kind" with the plaintiffs, Best and S & P "owed no duty which was breached, and that S & P and Best are not accountable to plaintiffs under the federal securities laws for their stock speculations." 387 F.Supp. at 905. Moreover, the Court so held "even though on the basis of the company's published data they [S & P and Best] express as their opinion a recommendation of the security." *Id.*

The Court in *In re Republic* noted that there was no allegation that defendants possessed any inside information or had greater access to information concerning Republic than investors or in any way participated in the underlying fraud. *Id.* at 905–06. Thus, the Court concluded:

> In the absence of such connection, [defendants] simply do not fall into any categories of non-privity parties who have been held liable to defrauded purchasers and sellers under Rule 10b–5.

387 F.Supp. at 906.

Unlike *Republic*, however, the Bondholder plaintiffs here have alleged both (1) a relationship between Duff & Phelps and Towers and (2) that Duff & Phelps had access to inside financial information about Towers and its Healthcare Subsidiaries. The complaint asserts that Duff & Phelps was hired by Towers specifically to rate the Bonds with the "AA" rating required by the Offering Memoranda. (Cplt. ¶ 63.) As part of the rating process and its "extensive due diligence," Duff & Phelps received "certain detailed reports from Towers" including quarterly certificates of each Funding Corporation's compliance with the collateral coverage ratio, detailed Servicer Accounting Reports and annual reports. (Cplt. ¶ 65.) Additionally, in its evaluation of Towers, Duff & Phelps reviewed Towers' servicing operations, data processing systems and financial situation generally. (Cplt. ¶ 66.) Further, the complaint refers to several Duff & Phelps documents which set forth the exhaustive review process Duff & Phelps undertakes before issuing a bond rating. (Cplt. ¶¶ 120–22 & Cplt. Exs. N, O, P.) Clearly, much of the information Duff & Phelps obtained and evaluated was Towers' "inside information" that was not disseminated publicly. Thus, this case is vastly different from the situation in *Republic* where the rating company relied solely on public information about the company it rated.[7]

Thus, I recommend that the Court hold that plaintiffs' complaint alleges actionable material misrepresentations sufficient to satisfy that element of a Rule 10b–5 cause of action.[8]

---

**7.** Similarly, this case is distinguishable from *Mallinckrodt Chemical Works v. Goldman, Sachs & Co.*, 420 F.Supp. 231 (S.D.N.Y.1976), discussed in *In Re Towers*, 93 Civ. 0810 (S.D.N.Y. May 30, 1996) (Report & Recommendation to grant Duff & Phelps' motion to dismiss action by Noteholders), at pp. 45–46. In *Mallinckrodt*, the Court held that Dunn & Bradstreet was not liable for its inaccurate credit ratings since those rat-ings were not based upon inside information. 420 F.Supp. at 243.

**8.** Moreover, as plaintiffs note in their brief (Plfs' Br. at 27 n. 17), plaintiffs also have adequately alleged a number of oral misrepresentations made by Duff & Phelps directly to certain of the plaintiffs. (Cplt. ¶¶ 116(a)–(i).)

### 2. *Plaintiffs Have Sufficiently Alleged Scienter*

■ Duff & Phelps alleges that plaintiffs have failed to adequately allege sufficient facts "to create the 'strong inference' that Duff & Phelps acted with either fraudulent intent or recklessness." (D & P Br. at 19.)

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n. 12, 96 S.Ct. 1375, 1381 & n. 12, 47 L.Ed.2d 668 (1976), the Supreme Court held that a private cause of action for damages will not lie under section 10(b) and Rule 10b–5 "in the absence of any allegation of 'scienter,'" which the Court defined as a "mental state embracing intent to deceive, manipulate or defraud." The Supreme Court did not determine whether reckless behavior is sufficient. *Id.*

In *In re Leslie Fay Cos.*, 871 F.Supp. 686 (S.D.N.Y.1995), the Court reviewed the case law and found that the Second Circuit has approached § 10(b) scienter in at least three different ways:

> First, ... unqualified allegations of recklessness are sufficient to satisfy the scienter requirement of § 10(b) and Rule 10b–5.... [Second] [i]n the *Rolf* line of cases that developed under the now defunct aiding and abetting theory, the court allowed allegations of recklessness to satisfy the scienter requirement only if the aider and abettor had a fiduciary relationship with the plaintiff.... [I]n the [third] line of cases the court has indicated that § 10(b) scienter requires either allegations of actual intent or circumstances implying a strong inference of actual intent.

871 F.Supp. at 691–92. The Court reiterated its choice of the third line of cases as establishing the appropriate scienter standard. *Id.* at 692. Relying on the decision of *In re Fischbach Corp. Sec. Litig.*, 89 Civ. 5826, 1992 WL 8715 (S.D.N.Y. January 15, 1992), the Court held that at least as to outsiders, "'[Rule] 10b–5 proscribes only behavior which is either deliberate or so reckless that an inference of fraudulent intent might be drawn by a reasonable finder of fact.'" *In re Leslie Fay*, 871 F.Supp. at 692. Thus,

"fraudulent intent, or recklessness rising to the level of conscious behavior, is required to underpin a claim brought under § 10(b)." *O'Brien v. Price Waterhouse*, 740 F.Supp. 276, 280 (S.D.N.Y.1990), *aff'd*, 936 F.2d 674 (2d Cir.1991).

For purposes of satisfying Fed.R.Civ.P. 9(b)'s particularity requirement, plaintiffs are required to allege facts that give rise to a "strong inference of fraudulent intent," which may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *E.g., Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994).

Plaintiffs have plead, in great detail, not only a number of written and oral misrepresentations and omissions made by Duff & Phelps, but also circumstantial evidence of Duff & Phelps' "conscious misbehavior or recklessness" approaching actual intent.

The complaint describes in a very detailed manner, based on Duff & Phelps' own documents, Duff & Phelps' system of Bond rating. *See* Duff & Phelps' description of its rating "due diligence" process contained in the three Duff & Phelps' pamphlets, "The Rating of Consumer Receivables," "Credit Decisions" and "Servicer Review Policy." (Cplt. ¶¶ 120–22 & Cplt. Exs. N, O, P, summarized at page 10, above.)[9] According to Duff & Phelps' own description of its review procedure, Duff & Phelps must have had extensive and intimate knowledge of the inner workings of Towers and its Healthcare Subsidiaries. Such an investigation would have revealed at least some of the ways Towers violated the Bond program's structure and informed Duff & Phelps that its Bond ratings were inaccurate.

The Court finds adequate factual basis from which one may infer that if Duff & Phelps conducted the extensive review process it described, Duff & Phelps discovered

---

**9.** Additionally, Duff & Phelps required that the Indenture and Servicing Agreements provide for Duff & Phelps to receive monthly, quarterly and annual reports from the Funding Corporations to facilitate Duff & Phelps' ongoing rating process. (Cplt. ¶¶ 65, 119.)

or was "willfully blind" to several violations of the Bond program by Towers indicating that Duff & Phelps' "AA" Bond rating was inaccurate. Plaintiffs have alleged an overwhelming number of ways that Towers failed to comply with the Bond program as designed or approved by Duff & Phelps including:

- Towers purchased receivables from Providers pursuant to Healthcare Purchase Contracts that were not substantially identical to those described in the Indentures, and improperly purchased receivables that were not owned by the Providers free from any prior sale, lien, encumbrance or security interest;

- Third–Party Obligors and Providers failed to make deposits directly to the Lockbox Accounts as required;

- The Funding Corporations were not in compliance with the Provider Concentration Limitations, were violating the Aging Limitations, and were not properly computing the Collateral Coverage ratios;

- The Funding Corporations improperly engaged in intercompany transfers of receivables, invested funds with affiliates, commingled assets with those of other corporations in violation of the Indentures, and advanced monies to Towers unrelated to the purchase of receivables;

- Towers failed to provide to Duff & Phelps the detailed itemization of receiv-

ables required by the Servicing Agreements;

- Towers, and therefore the Funding Corporations, had receivables serving as collateral for the Bonds that were not of adequate strength; and

- Towers was purchasing receivables payable by Third Party Obligors not rated "A" or better.

(Cplt. ¶ 125.) [10]

Because Duff & Phelps' self-described due diligence process would have alerted it to these Indenture violations, these facts constitute strong circumstantial evidence that Duff & Phelps either had knowledge of these violations or willfully disregarded the violations, *i.e.*, that Duff & Phelps' Bond ratings and other misrepresentations and omissions were made with knowledge of falsity or at least extreme recklessness.[11]

Duff & Phelps argues that, beyond pleading a factual basis from which one may infer scienter, plaintiffs are required to plead facts showing that Duff & Phelps actually knew this information from its due diligence process. (D & P Br. at 20.) Although allegations of fraud are required to be made with specificity, plaintiffs are not required to plead evidence. *See, e.g., Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Lehman·Broth-*

---

**10.** It is also important to remember that Duff & Phelps rated five different series of THRFC Bonds:

> The Amended Complaint alleges that the violations with respect to THRFC I commenced—and that Duff & Phelps learned of them—within months of the operation's commencement. (Am.Compl. ¶ 126.) It also alleges that the subsequent Funding Corporation issuances were part of a seriatim offering of substantially identical securities involving the same servicer—Towers. (Am.Compl. ¶¶ 5, 127) Duff & Phelps' knowledge that the THRFC I safeguards were not being observed is thus obviously sufficient basis to conclude that the same safeguards could not be relied upon for subsequent issuances.

(Plfs Br. at 41–42.)

**11.** Duff & Phelps claims that "[t]his Court has frequently rejected 'access to information' as a basis for inferring the scienter necessary to state a claim under Rule 10b–5." (D & P Reply Br. at 21, citing *Sable v. Southmark/Envicon,* 819 F.Supp. 324, 337 (S.D.N.Y.1993); *Devaney v.*

*Chester,* 709 F.Supp. 1255, 1263 (S.D.N.Y.1989); *The Limited, Inc. v. McCrory,* 683 F.Supp. 387, 394 (S.D.N.Y.1988); and *Ross v. Warner,* 480 F.Supp. 268, 272 (S.D.N.Y.1979).) In the cases cited by Duff & Phelps, the plaintiffs' scienter claim was that accountants, lawyers and similar professionals had a right of access to corporate information and thus could have discovered the fraud. The courts, quite correctly, held that such a right of access was not enough to show that the defendant was anything more than negligent. Here, by contrast, Duff & Phelps' own descriptions of its process for rating securities disclosed that Duff & Phelps reviewed various aspects of the Bond program in arriving at its rating. Assuming Duff & Phelps proceeded as it represented in rating securities—and plaintiffs allege on information and belief that it did (Cplt. ¶¶ 65–69, 120–22)—it must have discovered Towers' fraud. Thus, Duff & Phelps either knew its rating and other representations were false or it was reckless in issuing its ratings.

*ers Commercial Corp. v. Minmetals Int'l Non–Ferrous Metals Trading Co.*, 94 Civ. 8301, 1995 WL 608323 at *3 (S.D.N.Y. Oct. 16, 1995) (plaintiff "need not marshall all its evidence at this time before discovery has taken place."); *Ballan v. Wilfred Am. Educ. Corp.*, 720 F.Supp. 241, 252 (E.D.N.Y.1989) ("[p]laintiff need not plead his evidence, so long as he gives defendants notice of what they are charged with.").

Duff & Phelps also argues that plaintiffs' allegations at best charge Duff & Phelps with negligence, which does not support a Rule 10b–5 action. (D & P Br. at 28.) Duff & Phelps relies upon *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256 (S.D.N.Y.1989). (D & P Br. at 28.)

In *Goldman v. McMahan,* shareholders sued an accounting firm under Rule 10b–5, alleging that in preparing financial statements used in connection with a public offering, the accounting firm "failed to properly audit" the company's books and records. 706 F.Supp. at 259. The Court found that these allegations at most supported an inference of negligence, but did not rise to the required level of recklessness required in a 10b–5 action. *Id.* at 259–60.

Clearly, in the case at bar, plaintiffs have asserted much more than "boilerplate" allegations of recklessness. In contrast to the *Goldman* case, plaintiffs here have described in detail Duff & Phelps' intimate knowledge of Towers and its Healthcare Subsidiaries through Duff & Phelps' self-described due diligence process. Moreover, plaintiffs have alleged numerous specific violations of the Indenture and Servicing Agreement that Duff & Phelps was purportedly monitoring. Thus, the close relationship between Duff & Phelps and Towers and the Healthcare Subsidiaries, and Duff & Phelps' self-described

rating due diligence and monitoring responsibilities far surpass the general negligence allegations made in *Goldman.*

I find that plaintiffs have sufficiently alleged scienter for purposes of Rule 10b–5. Therefore, I recommend that the Court deny Duff & Phelps' motion to dismiss plaintiffs' Rule 10b–5 and common law fraud causes of action.[12]

### III. PLAINTIFFS HAVE FAILED TO SUFFICIENTLY ALLEGE DUFF & PHELPS' AIDING AND ABETTING RICO LIABILITY

Plaintiffs' second cause of action alleges that Duff & Phelps is liable for aiding and abetting Hoffenberg's RICO violation, pursuant to 18 U.S.C. § 1962(c). (*See* Cplt. ¶¶ 133–45.) Duff & Phelps moves to dismiss on the grounds that plaintiffs have failed to plead that: (1) Duff & Phelps "aided and abetted two predicate [RICO] acts"; (2) "Duff & Phelps was 'employed by or associated with' the alleged enterprise"; or (3) that "Duff & Phelps either 'conduct[ed] or participat[ed], directly or indirectly' in the conduct of the enterprise's affairs through a pattern of racketeering activity." (D & P Br. at 38–39.)

#### 1. *There is No Tort of Aiding and Abetting a RICO Violation*

■ In a recent exhaustive opinion, Judge Mukasey held that there is no federal tort of aiding and abetting a RICO violation. *Department of Economic Development v. Arthur Andersen & Co.*, 924 F.Supp. 449, 475–78 (S.D.N.Y.1996) (citing the Supreme Court's analysis in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128

---

**12.** Plaintiffs have adequately alleged the remaining Rule 10b–5 elements of reliance and causation. In their complaint, plaintiffs assert that they relied on Duff & Phelps' false and misleading ratings contained in the Offering Memoranda in purchasing the Bonds. (Cplt. ¶¶ 1, 114, 129, 130.) Moreover, plaintiffs also allege that they relied on other oral and written misrepresentations and omissions described in detail in the complaint in purchasing the Bonds. (Cplt. ¶¶ 116–18, 123–29.) Plaintiffs further alleged that they "would not have bought or retained the

Bonds but for those ratings and other representations." (Cplt. ¶ 129.) Duff & Phelps, briefs do not challenge plaintiffs' allegations of reliance and causation.

Both Duff & Phelps and plaintiffs agree that plaintiffs state law fraud claim rises or falls with the Rule 10b–5 claim. (Plfs' Br. at 55; D & P Br. at 43; D & P Reply Br. at 36 n. 28.) Accordingly, the Court recommends that Duff & Phelps' motion to dismiss plaintiffs' common law fraud claim be denied for the same reasons as apply to plaintiffs' Rule 10b–5 claim.

L.Ed.2d 119 (1994)).[13] The Court agrees with Judge Mukasey's analysis and recommends dismissal of plaintiffs' claim of aiding and abetting a RICO violation on the ground that there is no such cause of action.

### 2. *Even If an Aiding and Abetting Claim Were Viable, Plaintiffs' Claim Fails Because Duff & Phelps Did Not Operate or Manage the Enterprise*

█ Even if the Court were to conclude that an aiding and abetting claim were viable, plaintiffs' aiding and abetting claim fails because Duff & Phelps did not "operate or manage" the enterprise, as required by Supreme Court precedent.

In order to establish an aiding and abetting cause of action under 18 U.S.C. § 1962(c),[14] plaintiffs must establish: "(1) the existence of a primary ... RICO violation; (2) knowledge of the ... violation on the part of the alleged aider and abettor; and (3) facts showing substantial assistance by the aider and abettor in the achievement of the violation." *Dreieck Finanz AG v. Sun,* 89 Civ. 4347, 1990 WL 11537 at *3 (S.D.N.Y. Feb. 9, 1990) (citing, *inter alia, Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983); *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 119 (2d Cir.1982)). Additionally, as a result of the Supreme Court's decision in *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), a plaintiff alleging § 1962(c) liability must allege that the defendant participated in the operation or management of the enterprise.

In *Reves v. Ernst & Young,* purchasers of demand notes from a farmer's cooperative brought securities fraud and RICO claims against the cooperative's accountants. The Supreme Court tackled the "narrow question" of the meaning of the phrase "to conduct or participate" for purposes of establish-

ing RICO liability pursuant to 18 U.S.C. § 1962(c). 507 U.S. at 177, 113 S.Ct. at 1169. The Court concluded that, "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Id.* at 179, 113 S.Ct. at 1170. Specifically, the Supreme Court held that "Congress did not intend to extend RICO liability under § 1962(c) beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity." *Id.* at 184, 113 S.Ct. at 1172. The Court thus approved the "operation or management" test—that is "that one is not liable under [§ 1962(c) ] unless one has participated in the operation or management of the enterprise itself." *Id.* at 183, 113 S.Ct. at 1172. Applying the test, the Court dismissed Reves' § 1962(c) claim for failure to allege that an accountant who had prepared audit reports for a codefendant participated in the operation or management of the enterprise.

Plaintiffs assert that *Reves* is inapplicable because it did not explicitly address aiding and abetting liability. (Plfs' Br. at 46.) While it is true that *Reves* did not explicitly address aiding and abetting liability, this Court sees no reason that *Reves* should not have equal applicability to an "aiding and abetting" § 1962(c) claim. As the Supreme Court noted in *Reves,* § 1962(c) was intended to be a more limited provision than §§ 1962(a) and (b). 507 U.S. at 185, 113 S.Ct. at 1173. Whereas § 1962(c) is intended to apply to persons "employed by or associated with" an enterprise, subsections (a) and (b) do not contain such restrictions.

Several decisions in this district have held that *Reves* requires plaintiffs alleging "aiding and abetting" § 1962(c) liability to allege that the aider/abettor participated in the operation or management of the enterprise. As

---

**13.** Ironically, plaintiffs cite the pre-*Central Bank* decision in *Department of Economic Development,* 683 F.Supp. 1463, 1482–83 (S.D.N.Y. 1988), for the proposition that "it is well established that aiding and abetting a civil RICO violation is actionable." (Plfs' Br. at 44.) The 1988 decision was effectively reversed by Judge Mukasey's post-*Central Bank* decision.

**14.** 18 U.S.C. § 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

the Court recently held in *131 Main Street Assoc. v. Manko,*

> We do not read the operation-or-management rule enunciated in *Reves* as changing the rule that "[c]ivil RICO liability can be predicated on aiding and abetting the commission of the predicate acts by the primary offender." Clearly, a person can operate or manage an enterprise and yet, through delegation, avoid directly committing predicate acts.

897 F.Supp. 1507, 1528 n. 17 (S.D.N.Y.1995) (citation omitted). *See also, e.g., In re Faleck & Margolies, Ltd.,* 89 B11140, 1995 WL 33631 at *17 n. 16 (S.D.N.Y. Jan. 30, 1995) ("To be liable for aiding and abetting a violation of Section 1962(c), a defendant must have (1) aided and abetted the commission of at least two predicate acts; and (2) participated in the operation or management of the enterprise.") (citing cases); *Solow v. Delit,* 90 Civ. 2273, 1993 WL 322838 at *8 n. 1 (S.D.N.Y. Aug. 16, 1993) (applying *Reves* test to attorney defendants charged with aiding and abetting RICO; court found "question of fact" as to whether attorney defendant "participated either directly or indirectly in the operation or management of" the enterprise); *Amalgamated Bank of New York v. Marsh,* 823 F.Supp. 209, 220 (S.D.N.Y.1993) (Court dismissed claim that defendant aided and abetted RICO scheme of another defendant who did participate in the operation and management of the enterprise, finding that this does not satisfy the *Reves* test). Since plaintiffs have not cited any post-*Reves* decisions to the contrary from this district,[15] and the Court has not found any, the application of the *Reves* decision to aiding and abetting § 1962(c) liability—*i.e.,* the requirement that the aider/abettor must have participated in the operation or management of the enterprise—appears to be the law of this district (assuming that an aiding and abetting claim remains viable at all in this district).

As interpreted by courts in this district and others, the "operation and management"

test set forth by the Supreme Court in *Reves* is a very difficult test to satisfy. For example, in *Biofeedtrac, Inc. v. Kolinor Optical Enter. & Consultants,* 832 F.Supp. 585, 591–92 (E.D.N.Y.1993), the Court held that an attorney defendant was not liable under § 1962(c) "[e]ven though he may have intentionally assisted a scheme to defraud," since his participation was confined to providing legal advice and legal services. Likewise, in *Strong & Fisher, Ltd. v. Maxima Leather, Inc.,* 91 Civ. 1779, 1993 WL 277205 at *1 (S.D.N.Y. July 22, 1993), the Court held that, even though corporate defendants had "substantial persuasive power to induce management to take certain actions and had the legal authority to take other actions that could affect these corporations," such power was "not equivalent to having power to 'conduct or participate directly or indirectly in the conduct in the affairs of those corporations.'" Thus, "[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." *University of Md. v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993); *accord, e.g., Morin v. Trupin,* 835 F.Supp. 126, 135 (S.D.N.Y.1993) (citing cases).

Applying the *Reves* "operation or management" test, the Court finds that plaintiffs have failed to allege that Duff & Phelps participated in the operation or management of the Towers enterprise. Much like an attorney or accountant hired for a specific purpose, Duff & Phelps was hired to rate the Bonds and monitor the Bond programs so as to continue the ratings. Although Duff & Phelps was privy to confidential Towers information throughout the rating process, and had influence or even "substantial persuasive power" in structuring the Bond program, such influence does not constitute operation or management of Towers. *See Strong & Fisher v. Maxima,* 1993 WL 277205 at *1. Accepting plaintiffs' allegations that Duff & Phelps knowingly assisted in Towers' fraudu-

---

**15.** By letter brief dated January 17, 1994, plaintiffs cite several cases for the proposition that *Reves* is inapplicable to aiding and abetting RICO claims. The one cited case from this district, *Tribune Co. v. Purcigliotti,* 869 F.Supp. 1076, 1096–99 (S.D.N.Y.1994), *aff'd,* 66 F.3d 12 (2d Cir.1995), supports this Court's view since it applies the *Reves* test to a defendant alleged to have been liable for aiding and abetting primary RICO claims. 869 F.Supp. at 1097 & 1098 n. 11.

lent scheme, such assistance is clearly insufficient to establish Duff & Phelps' operation or control of Towers for purposes of aiding and abetting liability pursuant to § 1962(c). *See Biofeedtrac v. Kolinor,* 832 F.Supp. at 592.

Since plaintiffs fail to allege that Duff & Phelps was involved in the "operation or management" of Towers, I recommend that the RICO § 1962(c) cause of action against Duff & Phelps be dismissed.[16]

## IV. PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A COMMON LAW NEGLIGENT MISREPRESENTATION CLAIM

### A. Choice of Law

Plaintiffs contend that Illinois law should be applied to the state law claims, while Duff & Phelps maintains that New York law is applicable.

In determining which jurisdiction's law is applicable, this court must apply the choice of law rules of the forum state, in this case New York. *See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).

In tort actions, New York courts apply an "interest analysis," also known as a "grouping of contacts" analysis, which provides that "'controlling effect' must be given 'to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'" *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 196, 491 N.Y.S.2d 90, 94, 480 N.E.2d 679 (1985) (quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279 (1963)); *see also, e.g., AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 270 (2d Cir.1992). This "interest analysis" has been applied in New York to causes of action for negligent misrepresentation and fraud. *Guildhall Ins. Co. v. Silberman,* 688 F.Supp. 910, 912–13 (S.D.N.Y.1988) (applying New York "interest analysis" to fraud and

negligent misrepresentation claims and holding that New York law applies); *see also, e.g., Rosenberg v. Pillsbury Co.,* 718 F.Supp. 1146, 1149 (applying New York "interest analysis" to fraud claim and determining that Massachusetts law applies); *Conan Properties, Inc. v. Mattel, Inc.,* 712 F.Supp. 353, 366 n. 24 (S.D.N.Y.1989) (applying "interest analysis" to fraud claim to hold New York law applies).

"Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Schultz v. Boy Scouts,* 65 N.Y.2d at 197, 491 N.Y.S.2d at 95, 480 N.E.2d 679; *accord, e.g., AroChem v. Buirkle,* 968 F.2d at 270. "[W]hen the domiciles of the parties differ, the location of the injury determines the governing substantive law absent special circumstances." *Gray v. Busch Entertainment Corp.,* 886 F.2d 14, 15 (2d Cir.1989) (per curiam). "Where interest analysis does not point clearly to the application of another state's law, the law of the place where the tort occurred prevails." *Crossland Savings FSB v. Rockwood Ins. Co.,* 692 F.Supp. 1510, 1512 (S.D.N.Y.1988).

An analysis of the parties' domiciles in this case is inconclusive. Although 12 of the 26 plaintiffs reside in Illinois and defendant Duff & Phelps is incorporated and has its principal place of business in Illinois, the remaining 14 plaintiffs are domiciled in various states.

As to the "locus of the tort," the parties dispute where the negligent misrepresentations and fraud occurred. Plaintiffs argue that the main misrepresentation in question, the Bond rating, issued from the Illinois office of Duff & Phelps, and therefore Illinois law should apply. (Plfs' Br. at 52–53.)

■ However, the Court agrees with Duff & Phelps that the locus of the tort was in New York. To determine the locus of the tort of negligence or fraud, the Courts have traditionally looked to the place where the

---

**16.** Accordingly, I need not consider whether the other RICO requirements have been adequately plead. The Court also need not consider whether the provision of the Private Securities Litigation Reform Act of 1995 that precludes RICO actions based on predicate acts of securities laws violations, Section 107 (Pub.L. No. 104–67, 109 Stat. 737, 758 (Dec. 22, 1995)), applies retroactively. The Court notes that in *In re Prudential Securities Inc. Limited Partnerships Litig.,* 930 F.Supp. 68, 80–81 (S.D.N.Y.1996), Judge Pollack concluded that it was not retroactive.

"injury was inflicted" rather than the place where the fraudulent act originated. *E.g., Schupak v. Florescue,* 92 Civ. 1189, 1993 WL 256572 at \*4 (S.D.N.Y. July 8, 1993). In assessing the place where plaintiffs' injury occurred, the Court looks at the "transaction at the heart of the case." *See Crossland v. Rockwood,* 692 F.Supp. at 1512.

In this case, all of the alleged misrepresentations concern the operation of the Bond program issued by Towers in New York. The Bonds were all issued by Towers' Healthcare Subsidiaries, and the agreements were negotiated and consummated at Towers' offices, in New York. The operation of the Bond program was governed by New York law, as provided in both the Subscription Agreement and the Indenture Agreement. (*See* Cplt. Ex. A § 4.03; Cplt. Ex. B § 111.) The fact that plaintiffs themselves consented to the application of New York law to govern the Bond programs clearly weighs in favor of applying New York law to the transaction as a whole. *See, e.g., Don King Productions, Inc. v. Douglas,* 735 F.Supp. 522, 528 (S.D.N.Y.1990) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 482, 105 S.Ct. 2174, 2187, 85 L.Ed.2d 528 (1985) (choice of law provision is a factor to consider)). Indeed, plaintiffs' complaint asserts that "a substantial part of the events or omissions giving rise to these claims occurred" in the Southern District of New York. (Cplt. ¶ 40.)

Finally, New York has the greater interest in applying its own law to negligent misrepresentation and fraud causes of action, rather than Illinois. The main difference between Illinois and New York law in the area of negligent misrepresentation is New York's stringent privity requirement, discussed below. In a case such as this, where neither party is a New York resident, New York law should apply since

> New York has no policy or interest in applying foreign law against a foreign defendant in order to allow recovery for a

plaintiff, where the plaintiff could not recover were defendant a New York resident.

*Guildhall Ins. Co. v. Silberman,* 688 F.Supp. at 913 (quoting *In re AM Int'l Inc. Sec. Litig.,* 606 F.Supp. 600, 609 (S.D.N.Y.1985)). This is particularly true where, as here, the underlying contractual relationship was governed by New York law by agreement of the parties. *See Don King Productions v. Douglas,* 735 F.Supp. at 528. The expectation of all parties involved was clearly that New York law would govern the Bond program.

Thus, the Court recommends that New York law govern plaintiffs' state law claims.

### B. *Plaintiffs Have Sufficiently Stated a Claim for Negligent Misrepresentation*

 In New York, a plaintiff alleging a cause of action against a professional for negligent misrepresentation must allege that there was "actual privity of contract between the parties or a relationship so close as to approach that of privity." *Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 382, 590 N.Y.S.2d 831, 833, 605 N.E.2d 318 (1992). Here, Duff & Phelps is not alleged to have been in privity with plaintiffs, so the issue is whether a relationship so close as to approach that of privity existed.

The New York Court of Appeals has set out three prerequisites for professional liability to third parties with whom the professionals are not in contractual privity in *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985): [17]

> (1) the [professional] must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the [professionals] linking them to

17. Although the *Credit Alliance* test initially applied to accountants, it has subsequently been applied to other professionals such as attorneys, real estate appraisers, architects and realtors. *See, e.g., Guildhall v. Silberman,* 688 F.Supp. at 913 & n. 2 (applying privity requirement to "appraisers" of artifacts and citing New York cases where Courts applied privity requirements to architects and appraisers of real property). This Court sees no reason why it should not also apply the privity requirement to a securities rating company.

that party or parties, which evinces the [professionals'] understanding of that party or parties' reliance.

65 N.Y.2d at 551, 493 N.Y.S.2d at 443, 483 N.E.2d 110.

This Court finds that plaintiffs have sufficiently alleged a relationship "approaching privity" between plaintiffs and Duff & Phelps for purposes of surviving this motion to dismiss, because the Court cannot say that there are no facts pursuant to which plaintiffs could prevail.[18] Of course, Duff & Phelps is free to move for summary judgment on this claim after discovery.

As to the first prong, plaintiffs have sufficiently plead that Duff & Phelps was aware that its rating was to be used to enable Towers to sell the Bonds to investors: the Offering Memoranda stipulated that a precondition of the issuance of the Bonds was that they be rated "AA" by Duff & Phelps. (Cplt. ¶ 63 & Cplt. Ex. A at 74.) Duff & Phelps had "substantial influence in the drafting of the documents pursuant to which the [Bond] program was to be operated," and Duff & Phelps "consented to the use of its name and the assigned rating in connection with the disclosure documents, advertisements, and description of the issue." (Cplt. ¶ 63.) The complaint thus adequately alleges that the primary, if not exclusive, "end and aim" of Duff & Phelps' rating process was to ensure an "AA" rating so that the Bonds could be sold to investors. *See, e.g., Credit Alliance v. Arthur Andersen,* 65 N.Y.2d at 554, 493 N.Y.S.2d at 445, 483 N.E.2d 110.

As to the second prong, Duff & Phelps argues that plaintiffs' claim fails because plaintiffs have not alleged that Duff & Phelps had knowledge of the identity of each individual purchaser. (D & P Br. at 46–47.) The purpose of this prong is to protect a defendant from being subjected to liability for lawsuits brought over an "indeterminate time" by the members of "an indeterminate class." *Vereins–Und Westbank, AG v. Carter,* 691 F.Supp. 704, 710 (S.D.N.Y.1988) (Knapp, J.) (citing *Ultramares Corp. v. Touche,* 255 N.Y. 170, 179, 181, 174 N.E. 441 (1931)). In fact, "[f]ederal courts have typically dismissed negligent misrepresentation claims brought by members of the general investing public." *In re Time Warner Inc. Sec. Litig.,* 794 F.Supp. 1252, 1264 (S.D.N.Y. 1992); *In re Par Pharmaceutical, Inc. Sec. Litig.,* 733 F.Supp. 668, 686 (S.D.N.Y.1990).

Knowledge of the identity of each particular plaintiff is not necessary, however, if the defendant's representation is designed to target a "select group of qualified investors" rather than "the public at large." *Schwartz v. Michaels,* 91 Civ. 3538, 1992 WL 184527 at *32 (S.D.N.Y. July 23, 1992); *see also, e.g., MEI Int'l Inc. v. Schenkers Int'l Forwarders, Inc.,* 807 F.Supp. 979, 985 (S.D.N.Y.1992) ("In order to state an action for negligent misrepresentation where contractual privity is absent, the defendant must be aware of a specific party *or class of parties* intended to rely on the statement.") (emphasis added); *Duke v. Touche Ross & Co.,* 765 F.Supp. 69, 77 (S.D.N.Y.1991) (negligent misrepresentation claim upheld where accountants report "was not disseminated to the public at large" but rather "was distributed to a select group of qualified investors," *i.e.,* potential investors were to receive private placement memorandum for purchase of limited partnership interests); *Kidd v. Havens,* 171 A.D.2d 336, 340, 577 N.Y.S.2d 989, 991 (4th Dep't 1991) (even where a defendant did not know the name of the relying party at the time the misstatement was made, "the courts have been willing to impose liability upon defendants where, in the context of a particular transaction, the potential plaintiff or class of plaintiffs is fixed, definite, and identifiable.").

Plaintiffs have adequately alleged that Duff & Phelps knew that a select group of qualified investors would rely on the inaccu-

---

18. Even if the Court decides that the application of Illinois law is more appropriate, the outcome of this motion should not change. Illinois law provides that, in order to state a claim for negligent misrepresentation, a plaintiff must allege that a defendant who is in the business of furnishing information for the guidance of others negligently issued a false statement of fact on which plaintiff relied to his detriment. *Board of Educ. of City of Chicago v. A, C & S, Inc.,* 131 Ill.2d 428, 137 Ill.Dec. 635, 646, 546 N.E.2d 580, 591 (1989). Illinois law does not require plaintiff to plead privity, as New York law does. The complaint clearly states a claim for negligent misrepresentation under Illinois law.

rate rating contained in the Offering Memoranda. Duff & Phelps expressly consented to the use of its Bond rating in the Offering Memoranda. (Cplt. ¶ 63.) Moreover, Duff & Phelps was in direct contact with at least some of the plaintiffs, and with the broker dealers selling the Bonds. (Cplt. ¶¶ 64, 116.) Thus, Duff & Phelps knew that its misrepresentations were being circulated in a private placement memoranda to a select group of potential investors.[19]

As to the third and final prong, Duff & Phelps asserts that 20 of the 26 plaintiffs never had any direct communication with Duff & Phelps, and that the six plaintiffs who did had only "isolated and innocuous conversations" insufficient to establish the third prong. (D & P Br. at 48–49.) Duff & Phelps relies heavily on *Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 702–03, 586 N.Y.S.2d 87, 90, 597 N.E.2d 1080, 1083 (1992), in arguing that isolated conversations do not satisfy the "conduct" requirement. (D & P Br. at 49–51.) In *Security Pacific,* an institutional lender sued an accounting firm for negligence in auditing financial statements of a borrower. The lender alleged that the accounting firm knew the purpose of the audit, and further alleged that one of its officers had telephoned the accounting firm and received personal assurances of the audit's reliability. 79 N.Y.2d at 700, 586 N.Y.S.2d at 89, 597 N.E.2d at 1082. The Court of Appeals affirmed the lower court's grant of summary judgment in favor of the accounting firm, holding that New York law required plaintiffs to demonstrate " 'a direct nexus between the parties' " such as the " 'parties' direct communications and personal meetings.' " 79 N.Y.2d at 704, 586 N.Y.S.2d at 91, 597 N.E.2d at 1084 (quoting *Credit Alliance v. Arthur Andersen,* 65 N.Y.2d at 545, 493 N.Y.S.2d at 439, 483 N.E.2d at 113–14). The Court concluded that a single phone conversation between the parties—after the audit work was completed and limited to discussion in generalities—was insufficient as proof of

conduct linking the parties. 79 N.Y.2d at 705–06, 586 N.Y.S.2d at 92–93, 597 N.E.2d at 1085–86.

*Security Pacific,* however, is distinguishable. The plaintiff in *Security Pacific* did not claim that the accounting firm's report was to be prepared for the specific purpose of inducing the plaintiff's reliance, or that the firm had shaped its audit opinion to meet any of the plaintiff's needs. 79 N.Y.2d at 706, 586 N.Y.S.2d at 93, 597 N.E.2d at 1086. The *Security Pacific* Court further noted specifically that there was no allegation that the defendant accounting firm was aware that the "primary if not the exclusive end and aim" of auditing the client was to provide the plaintiff with the financial information it required. Rather, the defendant conducted the audit in question for the benefit of a client, and only incidentally for the use of those to whom the client might exhibit it thereafter. 79 N.Y.2d at 708, 586 N.Y.S.2d at 94, 597 N.E.2d at 1087. Finally, *Security Pacific* involved a summary judgment motion, not a motion to dismiss.

By contrast, as discussed above, plaintiffs here have sufficiently alleged both that (1) the "primary if not exclusive end and aim" of Duff & Phelps' Bond rating was so that the Bonds could be marketed and sold to the plaintiffs, and (2) Duff & Phelps had shaped the Bond rating program to meet the plaintiffs' need (*i.e.,* to attain an "AA" rating, thereby enabling the Bonds to be issued). Duff & Phelps' communications with six of the 26 plaintiffs discussing the rating process evidences an intent to assure plaintiffs of the validity of the rating and influence plaintiffs to purchase the Bonds. Moreover, because some of the purchasers of the THRFC II–V Bond offerings had already purchased in the earlier Bond offerings (*see* Cplt. ¶¶ 12–13, 16, 20, 23), Duff & Phelps was particularly aware of the "select group of qualified investors" to whom its ratings would be given to induce Bond purchases. When viewed in the larger context of Duff & Phelps' primary goal of enabling Towers to sell the Bond offerings to the plaintiffs, the allegations about Duff & Phelps' knowledge and conduct are sufficient

**19.** The Offering Memoranda provided that the "Bonds are being offered to a limited number of insurance companies, pension funds and similar institutional investors," in denominations of $500,000 and increments thereof. (Cplt. Ex. A: Offering Memoranda at Cover, p. 5; *see also id.* at 72.)

to approach privity—at least at the pleading stage.

*Duke v. Touche Ross & Co.,* 765 F.Supp. 69 (S.D.N.Y.1991), is directly on point. In *Duke,* investors in limited partnerships sued the accounting firm of Touche Ross, alleging that Touche Ross knew that documents it prepared would be used in the private placement offering memoranda to induce investors to purchase limited partnership interests. 765 F.Supp. at 71. Touche Ross moved to dismiss. With respect to the state law negligent misrepresentation claim, the Court applied the criteria set forth by the New York Court of Appeals in *Credit Alliance. Duke,* 765 F.Supp. at 77. The Court denied the motion to dismiss, stating:

> In *Ultramares* [*Corp. v. Touche, Niven & Co.,* 255 N.Y. 170, 174 N.E. 441 (1931)], the court was concerned with exposing accountants to liability to an "indeterminate class of persons who, presently or in the future, might ... rel[y] on a negligently inaccurate audit." 255 N.Y. 170, 174 N.E. 441, 446. In the instant case, on the other hand, the report at issue was not disseminated to the public at large. Rather, it was distributed to a select group of qualified investors. In addition, plaintiffs allege that defendant solicited some of them to invest in the Limited Partnerships. (Complaint ¶ 20.) Plaintiffs have met the pleading requirements for a claim of negligent misrepresentation. Defendant's motion to dismiss this claim is denied.

*Duke,* 765 F.Supp. at 77.

Here, as in *Duke,* the Offering Memoranda containing Duff & Phelps' ratings was distributed to a select group of qualified and "accredited" investors, not to the public at large. (*See* Cplt. Ex. A at 72–73.) The "group of qualified investors" who might invest in the limited partnership interests in *Duke* is, if anything, broader than the institutional investors to whom Towers' Bonds were being offered. In addition, as in *Duke,* Duff & Phelps spoke with some of the plaintiffs about investing in the Bonds.

Duff & Phelps, however, argues that *Security Pacific* "expressly rejected *Duke* as being a proper source for common law" with respect to New York privity requirements.

(D & P Reply Br. at 47 n. 31.) To the contrary, the *Security Pacific* Court only addressed *Duke* indirectly in rejecting a concern raised by the dissent. *Security Pacific,* 79 N.Y.2d at 708, 719–20, 586 N.Y.S.2d at 94, 101–02, 597 N.E.2d at 1094–95. The *Security Pacific* dissent pointed to *Duke* and other federal decisions to support their contention that New York already had a very restrictive privity requirement. *Security Pacific,* 79 N.Y.2d at 719–20, 586 N.Y.S.2d at 101–02, 597 N.E.2d at 1094–95. The *Security Pacific* majority responded to the dissent by stating that:

> It is particularly unnecessary to engage the dissenting opinion on its use of Federal lower court interpretations of New York substantive common law in this area because this Court's precedents are the best evidence of this State's common law and serve as the sole guiding and controlling basis for the Court's decision today.

*Id.* at 708, 586 N.Y.S.2d at 94, 597 N.E.2d at 1087 (citations omitted). The Court did not reject *Duke.* Indeed, *Duke* continues to be cited with approval after *Security Pacific. See In re Crazy Eddie Sec. Lit.,* 812 F.Supp. 338, 349 (E.D.N.Y.1993).

Moreover, because Rule 10b–5 and state law fraud claims survive against Duff & Phelps, and the negligent misrepresentation claim does not expand the scope of discovery, it particularly makes sense to permit the claim to proceed at this stage, and to revisit the "approaching privity" issue, after discovery, on a motion for summary judgment. *See Lasalle National Bank v. Duff & Phelps Credit Rating Co.,* 93 Civ. 4692, 1996 WL 393212 (S.D.N.Y. March 11, 1996 and April 9, 1996) (denying Shawmut motion to dismiss two of three claims without prejudice, where decision on motion would not affect scope of discovery).

**Duff & Phelps is Not Immunized from Liability as a "Publisher"**

 Duff & Phelps relies on *In re Scott Paper Co. Sec. Litig.,* 145 F.R.D. 366 (E.D.Pa.1992), in arguing that the publisher of a credit rating is a member of the free press entitled to the privileges and immunities accorded the press. (D & P Br. at 55–

56.) The Court rejects Duff & Phelps' argument.

In *Scott Paper*, the Court held that Standard & Poor's ("S & P"), a non-party, did not have to produce to the plaintiffs certain notes and other documents concerning S & P's communications with the defendant because S & P was protected by the First Amendment's qualified journalist privilege. The Court in *Scott Paper*, however, rested its decision on the fact that "[r]egardless of the nature of S & P's sources, the fact remains that S & P publishes information for the benefit of the general public." 145 F.R.D. at 370. The Court, therefore, focused on the fact that "[u]nlike an accountant or an individual's financial advisor, S & P, at its discretion, publishes its conclusions in its periodicals for the benefit of the general public." *Id.* at 369.

In the case at bar, unlike *Scott Paper*, plaintiffs allege that Duff & Phelps was specifically hired by Towers to rate the Bonds. (Cplt. ¶¶ 1, 9, 63–69.) Duff & Phelps' rating was privately contracted for and intended for use in the private placement Offering Memoranda, rather than for publication in a general publication. Thus, on the facts alleged in the complaint, the qualified journalist privilege does not entitle Duff & Phelps to dismissal of plaintiffs' negligent misrepresentation claim.

The other cases cited by Duff & Phelps on this point (D & P Br. at 56) are similarly inapposite. Both *Jaillet v. Cashman*, 115 Misc. 383, 189 N.Y.S. 743, 744 (Sup.Ct. N.Y.Co.1921), *aff'd mem.*, 202 A.D. 805, 194 N.Y.S. 947 (1st Dep't 1922), *aff'd mem.*, 235 N.Y. 511, 139 N.E. 714 (1923), and *First Equity Corp. of Florida v. Standard & Poor's Corp.*, 869 F.2d 175, 179 (2d Cir.1989), dismissed actions against publishers of financial information based on the fact that the information was broadly disseminated to the public at large, of which the plaintiff was merely a member, rather than to a limited number of investors.

The Court in *In Re Taxable Municipal Bond Sec. Litig.*, Civ. MDL 863, 1993 WL 591418 (E.D.La.1993), rejected Duff & Phelps' argument when made by S & P on a motion to dismiss a claim for its rating of bonds. In that case, "the third party complaints [against S & P] allege[d] that for a fee, S & P analyzed the claims-paying ability of ELIC and the investment quality of the bonds and assigned a 'AAA' rating, and that this rating was included in the offering materials and was relied upon by the various parties involved in issuing the bonds and the ultimate purchasers of the bonds." *Id.*, 1993 WL 591418 at *4. The Court denied S & P's motion to dismiss on First Amendment grounds. *Id.* The Court held:

Although S & P's publications may be afforded some protection under the First Amendment as commercial speech, the allegations in the third-party complaints are that S & P contracted to provide [rating] services in connection with each of the bond issues and knew that its rating would be disseminated to the public as part of the official statements [*i.e.*, offering memoranda], and S & P therefore played an active role in the dissemination of the allegedly fraudulent official statements. The dissemination of information through an official statement is subject to statutory and common law restrictions, including those of Section 10(b) and Rule 10b–5. Neither S & P's membership in the "financial media" nor its publication of the bond rating through its press media shields it from such generally applicable laws.... S & P stands in no better position from the perspective of First Amendment defenses than any other participant in the bond transactions.

*Id.* The Court further rejected application of the *Jaillet* decision because, *inter alia*, "the doctrine applies to the publication of financial information, not to dissemination by official statement as part of a bond issue." *Id.* at *5. This Court agrees and finds the *Taxable Municipal Bond* decision directly applicable to this case.

Moreover, Duff & Phelps' attempt to apply the "actual malice" standard found in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), is also misplaced. (*See* D & P Br. at 57.) In *New York Times v. Sullivan*, the Supreme Court held that in order for a public official to state a claim of libel against a publisher for a

defamatory falsehood about his or her official conduct, the official must prove that the "statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726. But the Supreme Court has held the *Times v. Sullivan* "actual malice" standard inapplicable to a credit reporting agency. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 762, 105 S.Ct. 2939, 2947, 86 L.Ed.2d 593 (1985) (Court permitted recovery of damages in defamation case against credit rating company for false statements found in credit report on lesser showing than "actual malice" because information was "solely in the individual interest of the speaker and its specific business audience"). *Dun & Bradstreet,* not *Times v. Sullivan,* applies to Duff & Phelps' ratings.

Accordingly, I recommend that the Court find that plaintiffs have adequately alleged a claim for negligent misrepresentation and deny Duff & Phelps' motion to dismiss that claim.

### CONCLUSION

For the reasons set forth above, I recommend that the Court grant Duff & Phelps' motion to dismiss the complaint's aiding and abetting RICO claim with prejudice, but deny Duff & Phelps' motion to dismiss the Rule 10b–5 claim and the state law fraud and negligent misrepresentation claims.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Whitman Knapp, 40 Centre Street, Room 1201, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Knapp. Failure to file objections may result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

### SERVICE OF THIS REPORT & RECOMMENDATION

A copy of this Report & Recommendation is being mailed to counsel for the Bondholder plaintiffs, counsel for Duff & Phelps and counsel for Shawmut in this action, and to plaintiffs' liaison counsel and defendants' liaison counsel in *In re Towers,* 93 Civ. 0810. Counsel for Duff & Phelps is to serve a copy of this Report & Recommendation on all other counsel of record (and unrepresented parties) in all Towers' matters.

Dated: June 19, 1996.